# BUCKLEY, SECRETARY OF STATE OF COLORADO *v.* AMERICAN CONSTITUTIONAL LAW FOUNDATION, INC., ET AL.

No. 97–930.   Argued October 14, 1998—Decided January 12, 1999

184

*Gale A. Norton*, Attorney General of Colorado, argued the cause for petitioner. With her on the briefs were *Richard A. Westfall*, Solicitor General, and *Maurice G. Knaizer*, Deputy Attorney General.

*Neil D. O'Toole* argued the cause for respondents. With him on the brief for respondents American Constitutional

Law Foundation, Inc., et al. was *John A. Sbarbaro. Kerry S. Hada* filed a brief for respondents David Aitken et al. *Bill Orr*, respondent, *pro se*, and *Mr. O'Toole* filed a brief.*

JUSTICE GINSBURG delivered the opinion of the Court.

Colorado allows its citizens to make laws directly through initiatives placed on election ballots. See Colo. Const., Art. V, §§ 1(1), (2); Colo. Rev. Stat. §§ 1–40–101 to 1–40–133 (1998). We review in this case three conditions Colorado places on the ballot-initiative process: (1) the requirement that initiative-petition circulators be registered voters, Colo. Rev. Stat. § 1–40–112(1) (1998); (2) the requirement that they wear an identification badge bearing the circulator's name, § 1–40–112(2); and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator, § 1–40–121.

Precedent guides our review. In *Meyer* v. *Grant*, 486 U. S. 414 (1988), we struck down Colorado's prohibition of payment for the circulation of ballot-initiative petitions. Petition circulation, we held, is "core political speech," because it involves "interactive communication concerning political change." *Id.*, at 422 (internal quotation marks omitted).

---

*Briefs of *amici curiae* urging reversal were filed for the State of Washington et al. by *Christine O. Gregoire*, Attorney General of Washington, and *Jean M. Wilkinson* and *William Berggren Collins*, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Alan G. Lance* of Idaho, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Andrew Ketterer* of Maine, *Mike Moore* of Mississippi, *W. A. Drew Edmondson* of Oklahoma, *Betty D. Montgomery* of Ohio, *Hardy Myers* of Oregon, and *Mark Barnett* of South Dakota; and for the Council of State Governments et al. by *Richard Ruda* and *Ronald D. Maines*.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *David C. Warren, Steven R. Shapiro*, and *Mark Silverstein;* and for the Initiative & Referendum Institute by *Stephen J. Safranek*.

*Barnaby W. Zall* filed a brief for National Voter Outreach, Inc., as *amicus curiae*.

First Amendment protection for such interaction, we agreed, is "at its zenith." *Id.*, at 425 (internal quotation marks omitted). We have also recognized, however, that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer* v. *Brown*, 415 U. S. 724, 730 (1974); see *Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351, 358 (1997); *Anderson* v. *Celebrezze*, 460 U. S. 780, 788 (1983). Taking careful account of these guides, the Court of Appeals for the Tenth Circuit upheld some of the State's regulations, but found the three controls at issue excessively restrictive of political speech, and therefore declared them invalid. *American Constitutional Law Foundation, Inc.* v. *Meyer*, 120 F. 3d 1092 (1997). We granted certiorari, 522 U. S. 1107 (1998), and now affirm that judgment.

I

The complaint in this action was filed in 1993 in the United States District Court for the District of Colorado pursuant to 42 U. S. C. § 1983; it challenged six of Colorado's many controls on the initiative-petition process. Plaintiffs, now respondents, included American Constitutional Law Foundation, Inc., a nonprofit, public interest organization that supports direct democracy, and several individual participants in Colorado's initiative process. In this opinion we refer to plaintiffs-respondents, collectively, as ACLF.[1]

---

[1] Individual plaintiffs included: David Aitken, who, as chairman of the Colorado Libertarian Party, had organized the circulation of several initiative petitions; Jon Baraga, statewide petition coordinator for the Colorado Hemp Initiative; Craig Eley and Jack Hawkins, circulators of petitions for the Safe Workplace Initiative and Worker's Choice of Care Initiative; Lonnie Haynes, an initiative-supporting member of ACLF; Alden Kautz, a circulator of numerous initiative petitions; Bill Orr, executive director of ACLF and a qualified but unregistered voter, who regularly participated in the petition process and wanted to circulate petitions; and William David Orr, a minor who wanted to circulate petitions. See *American Constitutional Law Foundation, Inc.* v. *Meyer*, 120 F. 3d 1092, 1096–1097 (CA10 1997); Brief for Respondents David Aitken et al. 2, 3, 5, 6.

ACLF charged that the following prescriptions of Colorado's law governing initiative petitions violate the First Amendment's freedom of speech guarantee: (1) the requirement that petition circulators be at least 18 years old, Colo. Rev. Stat. § 1–40–112(1) (1998);[2] (2) the further requirement that they be registered voters, *ibid.*;[3] (3) the limitation of the petition circulation period to six months, § 1–40–108;[4] (4) the requirement that petition circulators wear identification badges stating their names, their status as "VOLUNTEER" or "PAID," and if the latter, the name and telephone number of their employer, § 1–40–112(2);[5] (5) the requirement that circulators attach to each petition section[6] an affidavit con-

---

[2] Section 1–40–112(1) provides:

"No section of a petition for any initiative or referendum measure shall be circulated by any person who is not a registered elector and at least eighteen years of age at the time the section is circulated."

[3] To be a registered voter, one must reside in Colorado. See § 1–2–101(1)(b). ACLF did not challenge the residency requirement in this action.

[4] Section 1–40–108(1) provides in relevant part:

"No petition for any ballot issue shall be of any effect unless filed with the secretary of state within six months from the date that the titles, submission clause, and summary have been fixed and determined pursuant to the provisions of sections 1–40–106 and 1–40–107 . . . ."

[5] Section 1–40–112(2) provides:

"(a) All circulators who are not to be paid for circulating petitions concerning ballot issues shall display an identification badge that includes the words 'VOLUNTEER CIRCULATOR' in bold-faced type which is clearly legible and the circulator's name.

"(b) All circulators who are to be paid for circulating petitions concerning ballot issues shall display an identification badge that includes the words 'PAID CIRCULATOR' in bold-faced type which is clearly legible, the circulator's name, and the name and telephone number of the individual employing the circulator."

[6] A petition section is a "bound compilation of initiative forms . . . which . . . include . . . a copy of the proposed [ballot] measure; . . . ruled lines numbered consecutively for registered electors' signatures; and a final page that contains the affidavit required by section 1–40–111(2)." § 1–40–102(6).

taining, *inter alia*, the circulator's name and address and a statement that "he or she has read and understands the laws governing the circulation of petitions," § 1–40–111(2);[7] and (6) the requirements that initiative proponents disclose (a) at the time they file their petition, the name, address, and county of voter registration of all paid circulators, the amount of money proponents paid per petition signature, and the total amount paid to each circulator, and (b) on a monthly basis, the names of the proponents, the name and address of each paid circulator, the name of the proposed ballot measure, and the amount of money paid and owed to each circula-tor during the month, § 1–40–121.[8]

---

[7] Section 1–40–111(2) provides:

"To each petition section shall be attached a signed, notarized, and dated affidavit executed by the registered elector who circulated the petition section, which shall include his or her printed name, the address at which he or she resides, including the street name and number, the city or town, the county, and the date he or she signed the affidavit; that he or she has read and understands the laws governing the circulation of petitions; that he or she was a registered elector at the time the section of the petition was circulated and signed by the listed electors; that he or she circulated the section of the petition; that each signature thereon was affixed in the circulator's presence; that each signature thereon is the signature of the person whose name it purports to be; that to the best of the circulator's knowledge and belief each of the persons signing the petition section was, at the time of signing, a registered elector; and that he or she has not paid or will not in the future pay and that he or she believes that no other person has paid or will pay, directly or indirectly, any money or other thing of value to any signer for the purpose of inducing or causing such signer to affix his or her signature to the petition. The secretary of state shall not accept for filing any section of a petition that does not have attached thereto the notarized affidavit required by this section. Any signature added to a section of a petition after the affidavit has been executed shall be invalid."

[8] Section 1–40–121 provides in relevant part:

"(1) The proponents of the petition shall file ... the name, address, and county of voter registration of all circulators who were paid to circulate any section of the petition, the amount paid per signature, and the total

The District Court, after a bench trial,[9] struck down the badge requirement and portions of the disclosure requirements, but upheld the age and affidavit requirements and the six-month limit on petition circulation. See *American Constitutional Law Foundation, Inc.* v. *Meyer*, 870 F. Supp. 995, 1001–1004 (Colo. 1994). The District Court also found that the registration requirement "limits the number of persons available to circulate . . . and, accordingly, restricts core political speech." *Id.*, at 1002. Nevertheless, that court upheld the registration requirement. In 1980, the District Court noted, the registration requirement had been adopted by Colorado's voters as a constitutional amendment. See *ibid.* For that reason, the District Court believed, the restriction was "not subject to any level of scrutiny." *Ibid.*

The Court of Appeals affirmed in part and reversed in part. See 120 F. 3d 1092 (CA10 1997). That court properly sought guidance from our recent decisions on ballot access, see, *e. g., Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351 (1997), and on handbill distribution, see *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995). See 120 F. 3d, at 1097, 1103. Initiative-petition circulators, the Tenth Circuit recognized, resemble handbill distributors, in that both seek

amount paid to each circulator. The filing shall be made at the same time the petition is filed with the secretary of state. . . .

"(2) The proponents of the petition shall sign and file monthly reports with the secretary of state, due ten days after the last day of each month in which petitions are circulated on behalf of the proponents by paid circulators. Monthly reports shall set forth the following:

"(a) The names of the proponents;

"(b) The name and the residential and business addresses of each of the paid circulators;

"(c) The name of the proposed ballot measure for which petitions are being circulated by paid circulators; and

"(d) The amount of money paid and owed to each paid circulator for petition circulation during the month in question."

[9] The record included evidence submitted in support of cross-motions for summary judgment and at a bench trial. See *American Constitutional Law Foundation, Inc.* v. *Meyer*, 870 F. Supp. 995, 997 (Colo. 1994).

to promote public support for a particular issue or position. See *id.*, at 1103. Initiative-petition circulators also resemble candidate-petition signature gatherers, however, for both seek ballot access. In common with the District Court, the Tenth Circuit upheld, as reasonable regulations of the ballot-initiative process, the age restriction, the six-month limit on petition circulation, and the affidavit requirement. See *id.*, at 1098–1100, 1101.[10] The Court of Appeals struck down the requirement that petition circulators be registered voters, and also held portions of the badge and disclosure requirements invalid as trenching unnecessarily and improperly on political expression. See *id.*, at 1100, 1101–1105.

## II

As the Tenth Circuit recognized in upholding the age restriction, the six-month limit on circulation, and the affidavit requirement, States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally. See *Biddulph* v. *Mortham*, 89 F. 3d 1491,

---

[10] The Tenth Circuit recognized that "age commonly is used as a proxy for maturity," and that "maturity is reasonably related to Colorado's interest in preserving the integrity of ballot issue elections." 120 F. 3d, at 1101. Such a restriction, the Court of Appeals said, need not satisfy "[e]xacting scrutiny," for it is both "neutral" and "temporary"; it "merely postpones the opportunity to circulate." *Ibid.* As to the six-month limit, the Court of Appeals observed that an orderly process requires time lines; again without demanding "[e]laborate . . . verification," the court found six months a "reasonable window," a sensible, "nondiscriminatory ballot access regulation." *Id.*, at 1099 (internal quotation marks omitted). Finally, the court explained that the affidavit requirement properly responded to the State's need to "'ensure that circulators, who possess various degrees of interest in a particular initiative, exercise special care to prevent mistake, fraud, or abuse in the process of obtaining thousands of signatures of only registered electors throughout the state.'" *Id.*, at 1099–1100 (quoting *Loonan* v. *Woodley*, 882 P. 2d 1380, 1388–1389 (Colo. 1994) (en banc)). We denied ACLF's cross-petition regarding these issues. See 522 U. S. 1113 (1998).

1494, 1500–1501 (CA11 1996) (upholding single subject and unambiguous title requirements for initiative proposals to amend Florida's Constitution), cert. denied, 519 U. S. 1151 (1997); *Taxpayers United For Assessment Cuts* v. *Austin*, 994 F. 2d 291, 293–294, 296–297 (CA6 1993) (upholding Michigan procedures for checking voters' signatures on initiative petitions).[11] We have several times said "no litmus-paper test" will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon "no substitute for the hard judgments that must be made." *Storer*, 415 U. S., at 730; see *Timmons*, 520 U. S., at 359; *Anderson*, 460 U. S., at 789–790. But the First Amendment requires us to be vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas. See *Meyer*, 486 U. S., at 421. We therefore detail why we are satisfied that, as in *Meyer*, the restrictions in question significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions.[12] Our judgment is informed by other means Colorado employs to accomplish its regulatory purposes.

## III

By constitutional amendment in 1980, see Colo. Const., Art. V, § 1(6), and corresponding statutory change the next

---

[11] Nothing in this opinion should be read to suggest that initiative-petition circulators are agents of the State. Although circulators are subject to state regulation and are accountable to the State for compliance with legitimate controls, see, *e. g.*, Colo. Rev. Stat. §§ 1–40–111, 1–40–130 (1998), circulators act on behalf of themselves or the proponents of ballot initiatives.

[12] Our decision is entirely in keeping with the "now-settled approach" that state regulations "impos[ing] 'severe burdens' on speech . . . [must] be narrowly tailored to serve a compelling state interest." See *post*, at 206 (THOMAS, J., concurring in judgment).

year, see 1981 Colo. Sess. Laws, ch. 56, §4, Colorado added to the requirement that petition circulators be residents, the further requirement that they be registered voters.[13] Registration, Colorado's Attorney General explained at oral argument, demonstrates "commit[ment] to the Colorado law-making process," Tr. of Oral Arg. 10, and facilitates verification of the circulator's residence, see *id.*, at 10, 14. Beyond question, Colorado's registration requirement drastically reduces the number of persons, both volunteer and paid, available to circulate petitions. We must therefore inquire whether the State's concerns warrant the reduction. See *Timmons*, 520 U. S., at 358.

When this case was before the District Court, registered voters in Colorado numbered approximately 1.9 million. At least 400,000 persons eligible to vote were not registered. See 2 Tr. 159 (testimony of Donetta Davidson, elections official in the Colorado Secretary of State's office);[14] 120 F. 3d, at 1100 ("Colorado acknowledges there are at least 400,000 qualified but unregistered voters in the state.").[15]

---

[13] Colorado law similarly provides that only registered voters may circulate petitions to place candidates on the ballot. See Colo. Rev. Stat. § 1–4–905(1) (1998) (only "eligible elector" may circulate candidate petitions); § 1–1–104(16) ("eligible elector" defined as "registered elector").

[14] Volume 1 of the trial transcript is reprinted in Pro-Se Plaintiff's App. I in No. 94–1576 (CA10), and is cited hereinafter as 1 Tr. Volume 2 of the trial transcript is reprinted in Pro-Se Plaintiff's App. II in No. 94–1576 (CA10), and is cited hereinafter as 2 Tr.

[15] In fact, the number of unregistered but voter-eligible residents in Colorado at the time of the trial may have been closer to 620,000. See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 282 (1993) (Table 453).

More recent statistics show that less than 65 percent of the voting-age population was registered to vote in Colorado in 1997. See U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 289 (1997) (Table 463). Using those more recent numbers, Colorado's registration requirement would exclude approximately 964,000 unregistered but voter-eligible residents from circulating petitions. The proportion of

Trial testimony complemented the statistical picture. Typical of the submissions, initiative proponent Paul Grant testified: "Trying to circulate an initiative petition, you're drawing on people who are not involved in normal partisan politics for the most part. . . . [L]arge numbers of these people, our natural support, are not registered voters." 1 Tr. 128.

As earlier noted, see *supra*, at 190, the District Court found from the statistical and testimonial evidence: "The record does show that the requirement of registration limits the number of persons available to circulate and sign [initiative] petitions and, accordingly, restricts core political speech." 870 F. Supp., at 1002. Because the requirement's source was a referendum approved by the people of Colorado, however, the District Court deemed the prescription "not subject to any level of [judicial] scrutiny." *Ibid.* That misjudgment was corrected by the Tenth Circuit: "The voters may no more violate the United States Constitution by enacting a ballot issue than the general assembly may by enacting legislation." 120 F. 3d, at 1100.

The Tenth Circuit reasoned that the registration requirement placed on Colorado's voter-eligible population produces a speech diminution of the very kind produced by the ban on paid circulators at issue in *Meyer*. See 120 F. 3d, at 1100. We agree. The requirement that circulators be not merely voter eligible, but registered voters, it is scarcely debatable given the uncontested numbers, see *supra*, at 193, and n. 15, decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators.[16] Both provisions "limi[t] the number of voices who

voter-eligible but unregistered residents to registered residents in Colorado is not extraordinary in comparison to those proportions in other States. See generally *ibid.*

[16] Persons eligible to vote, we note, would not include "convicted drug felons who have been denied the franchise as part of their punishment," see *post*, at 229 (REHNQUIST, C. J., dissenting), and could similarly be

will convey [the initiative proponents'] message" and, consequently, cut down "the size of the audience [proponents] can reach." *Meyer*, 486 U. S., at 422, 423; see *Bernbeck* v. *Moore*, 126 F. 3d 1114, 1116 (CA8 1997) (quoting *Meyer*); see also *Meyer*, 486 U. S., at 423 (stating, further, that the challenged restriction reduced the chances that initiative proponents would gather signatures sufficient in number to qualify for the ballot, and thus limited proponents' "ability to make the matter the focus of statewide discussion"). In this case, as in *Meyer*, the requirement "imposes a burden on political expression that the State has failed to justify." *Id.*, at 428.

Colorado acknowledges that the registration requirement limits speech, but not severely, the State asserts, because "it is exceptionally easy to register to vote." Reply Brief 5, 6; see Brief for Petitioner 30–31. The ease with which qualified voters may register to vote, however, does not lift the burden on speech at petition circulation time. Of course there are individuals who fail to register out of ignorance or apathy. See *post*, at 219–220 (O'CONNOR, J., concurring in judgment in part and dissenting in part). But there are also individuals for whom, as the trial record shows, the choice not to register implicates political thought and expression. See 1 Tr. 14 (testimony of ballot-initiative organizer Jack

---

barred from circulating petitions. The dissent's concern that hordes of "convicted drug dealers," *post*, at 230, will swell the ranks of petition circulators, unstoppable by legitimate state regulation, is therefore undue. Even more imaginary is the dissent's suggestion that if the merely voter eligible are included among petition circulators, children and citizens of foreign lands will not be far behind. See *post*, at 231–232. This familiar parade of dreadfuls calls to mind wise counsel: "Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom." R. Bork, The Tempting of America: The Political Seduction of the Law 169 (1990). That same counsel applies to JUSTICE O'CONNOR's floodgate fears concerning today's decision, which, like *Meyer*, separates petition circulators from the proponents and financial backers of ballot initiatives. See *post*, at 226 (opinion concurring in judgment in part and dissenting in part).

Hawkins). A lead plaintiff in this case, long active in ballot-initiative support—a party no doubt " 'able and willing' to convey a political message," cf. *post*, at 219 (O'CONNOR, J., concurring in judgment in part and dissenting in part)—testified that his refusal to register is a "form of . . . private and public protest." 1 Tr. 223 (testimony of William Orr, executive director of ACLF). Another initiative proponent similarly stated that some circulators refuse to register because "they don't believe that the political process is responsive to their needs." *Id.*, at 58 (testimony of Jon Baraga). For these voter-eligible circulators, the ease of registration misses the point.[17]

The State's dominant justification appears to be its strong interest in policing lawbreakers among petition circulators. Colorado seeks to ensure that circulators will be amenable to the Secretary of State's subpoena power, which in these matters does not extend beyond the State's borders. See Brief for Petitioner 32. The interest in reaching law violators, however, is served by the requirement, upheld below, that each circulator submit an affidavit setting out, among several particulars, the "address at which he or she resides, including the street name and number, the city or town, [and] the county." Colo. Rev. Stat. § 1–40–111(2) (1998); see *supra*, at 189, n. 7. This address attestation, we note, has an immediacy, and corresponding reliability, that a voter's registration may lack. The attestation is made at the time a petition section is submitted; a voter's registration may lack that currency.

---

[17] JUSTICE O'CONNOR correctly observes that registration requirements for primary election voters and candidates for political office are "classic" examples of permissible regulation. See *post*, at 217 (opinion concurring in judgment in part and dissenting in part). But the hired signature collector, as this Court recognized in *Meyer*, is in a notably different category. When the Court unanimously struck down a ban on paying persons to circulate petitions, it surely did not imply that the State must therefore tolerate a private sponsor's hourly or piecework payment of persons in exchange for their vote or political candidacy.

ACLF did not challenge Colorado's right to require that all circulators be residents, a requirement that, the Tenth Circuit said, "more precisely achieved" the State's subpoena service objective. 120 F. 3d, at 1100. Nor was any eligible-to-vote qualification in contest in this lawsuit. Colorado maintains that it is more difficult to determine who is a state resident than it is to determine who is a registered voter. See Tr. of Oral Arg. 10, 14. The force of that argument is diminished, however, by the affidavit attesting to residence that each circulator must submit with each petition section.

In sum, assuming that a residence requirement would be upheld as a needful integrity-policing measure—a question we, like the Tenth Circuit, see 120 F. 3d, at 1100, have no occasion to decide because the parties have not placed the matter of residence at issue—the added registration requirement is not warranted. That requirement cuts down the number of message carriers in the ballot-access arena without impelling cause.

## IV

Colorado enacted the provision requiring initiative-petition circulators to wear identification badges in 1993, five years after our decision in *Meyer.* 1993 Colo. Sess. Laws, ch. 183, § 1.[18] The Tenth Circuit held the badge requirement invalid insofar as it requires circulators to display their names. See 120 F. 3d, at 1104. The Court of Appeals did not rule on the constitutionality of other elements of the badge provision, namely, the "requirements that the badge disclose whether the circulator is paid or a volunteer, and if paid, by whom." *Ibid.* Nor do we.

Evidence presented to the District Court, that court found, "demonstrated that compelling circulators to wear iden-

---

[18] Colorado does not require identification badges for persons who gather signatures to place candidates on the ballot. See generally Colo. Rev. Stat. § 1–4–905 (1998) (regulations governing candidate-petition circulators).

tification badges inhibits participation in the petitioning process." 870 F. Supp., at 1001. The badge requirement, a veteran ballot-initiative-petition organizer stated, "very definitely limited the number of people willing to work for us and the degree to which those who were willing to work would go out in public." 1 Tr. 127 (testimony of Paul Grant).[19] Another witness told of harassment he personally experienced as circulator of a hemp initiative petition. See 870 F. Supp., at 1001. He also testified to the reluctance of potential circulators to face the recrimination and retaliation that bearers of petitions on "volatile" issues sometimes encounter: "[W]ith their name on a badge, it makes them afraid." 1 Tr. 60 (testimony of Jon Baraga). Other petition advocates similarly reported that "potential circulators were not willing to wear personal identification badges." 870 F. Supp., at 1001–1002.

Colorado urges that the badge enables the public to identify, and the State to apprehend, petition circulators who engage in misconduct. See Brief for Petitioner 36–37; Reply Brief 17. Here again, the affidavit requirement, unsuccessfully challenged below, see *supra*, at 191, and n. 10, is responsive to the State's concern; as earlier noted, see *supra*, at 188–189, and n. 7, each petition section must contain, along with the collected signatures of voters, the circulator's name, address, and signature. This notarized submission, available to law enforcers, renders less needful the State's provision for personal names on identification badges.

While the affidavit reveals the name of the petition circulator and is a public record, it is tuned to the speaker's interest as well as the State's. Unlike a name badge worn at the time a circulator is soliciting signatures, the affidavit is separated from the moment the circulator speaks. As the Tenth Circuit explained, the name badge requirement "forces circu-

---

[19] See 1 Tr. 133 (testimony of Paul Grant) ("I would not circulate because I don't want to go to jail. And, I won't wear the badge because I don't think it's right.").

lators to reveal their identities at the same time they deliver their political message," 120 F. 3d, at 1102; it operates when reaction to the circulator's message is immediate and "may be the most intense, emotional, and unreasoned," *ibid.* The affidavit, in contrast, does not expose the circulator to the risk of "heat of the moment" harassment. Cf. 870 F. Supp., at 1004 (observing that affidavits are not instantly accessible, and are therefore less likely to be used "for such purposes as retaliation or harassment").

Our decision in *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995), is instructive here. The complainant in *McIntyre* challenged an Ohio law that prohibited the distribution of anonymous campaign literature. The writing in question was a handbill urging voters to defeat a ballot issue. Applying "exacting scrutiny" to Ohio's fraud prevention justifications, we held that the ban on anonymous speech violated the First Amendment. See *id.*, at 347, 357. "Circulating a petition is akin to distributing a handbill," the Tenth Circuit observed in the decision now before us. 120 F. 3d, at 1103. Both involve a one-on-one communication. But the restraint on speech in this case is more severe than was the restraint in *McIntyre*. Petition circulation is the less fleeting encounter, for the circulator must endeavor to persuade electors to sign the petition. See Tr. of Oral Arg. 21, 25–26. That endeavor, we observed in *Meyer*, "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." 486 U. S., at 421.

The injury to speech is heightened for the petition circulator because the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest. See 120 F. 3d, at 1102. For this very reason, the name badge requirement does not qualify for inclusion among the "more limited [election process] identification requirement[s]" to which we alluded in *McIntyre*. 514 U. S., at 353 ("We recognize that a State's enforce-

ment interest might justify a more limited identification requirement, but Ohio has shown scant cause for inhibiting the leafletting at issue here."); see *id.*, at 358 (GINSBURG, J., concurring). In contrast, the affidavit requirement upheld by the District Court and Court of Appeals, which must be met only after circulators have completed their conversations with electors, exemplifies the type of regulation for which *McIntyre* left room.[20]

In sum, we conclude, as did the Court of Appeals, that Colorado's current badge requirement discourages participation in the petition circulation process by forcing name identification without sufficient cause. We reiterate this qualification: In its final observation, the Court of Appeals noted that ACLF's "arguments and evidence focus[ed] entirely on [the circulator identification] requirement"; therefore, that court expressed no opinion whether the additional requirements—that the badge disclose the circulator's paid or volunteer status, and if paid, by whom—"would pass constitutional muster standing alone." 120 F. 3d, at 1104. We similarly confine our decision.

---

[20] As the Tenth Circuit observed, see 120 F. 3d, at 1101, neither *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988), nor *Martin* v. *City of Struthers,* 319 U. S. 141 (1943), supports the name identification Colorado requires petition circulators to wear. *Riley* invalidated a North Carolina law restricting solicitation of charitable contributions by professional fundraisers. *Martin* invalidated a city ordinance prohibiting knocking on the door or ringing the doorbell of any residence for the purpose of distributing literature. The Court observed in *Riley* that an unchallenged portion of the disclosure law required professional fundraisers to disclose their *professional status, i. e.,* their *employer's* name and address, to potential donors. 487 U. S., at 799, and n. 11. In dictum in *Martin,* the Court noted that "a stranger in the community" could be required to establish his identity and authority to act for the cause he purports to represent. 319 U. S., at 148, n. 14 (internal quotation marks omitted). Neither case involved a name badge requirement or any other specification that the solicitor's personal name be revealed. Nor was there in either case a counterpart to the affidavit, which puts each petition circulator's name and address on a public record.

## V

Like the badge requirement, Colorado's disclosure provisions were enacted post-*Meyer* in 1993. See 1993 Colo. Sess. Laws, ch. 183, § 1.[21] The Tenth Circuit trimmed these provisions. Colorado requires ballot-initiative proponents who pay circulators to file both a final report when the initiative petition is submitted to the Secretary of State, and monthly reports during the circulation period. Colo. Rev. Stat. § 1-40-121 (1998), set out *supra*, at 189-190, n. 8. The Tenth Circuit invalidated the final report provision only insofar as it compels disclosure of information specific to each paid circulator, in particular, the circulators' names and addresses and the total amount paid to each circulator. See 120 F. 3d, at 1104-1105. As modified by the Court of Appeals decision, the final report will reveal the amount paid per petition signature, and thus, effectively, the total amount paid to petition circulators. See *ibid.*

The Court of Appeals next addressed Colorado's provision demanding "detailed monthly disclosures." 120 F. 3d, at 1105. In a concise paragraph, the court rejected compelled disclosure of the name and addresses (residential and business) of each paid circulator, and the amount of money paid and owed to each circulator, during the month in question. See Colo. Rev. Stat. §§ 1-40-121(2)(b), (d) (1998). The Court of Appeals identified no infirmity in the required reporting of petition proponents' names, or in the call for disclosure of proposed ballot measures for which paid circulators were engaged. See §§ 1-40-121(2)(a), (c). We express no opinion whether these monthly report prescriptions, standing alone, would survive review.

In ruling on Colorado's disclosure requirements for paid circulations, the Court of Appeals looked primarily to our

---

[21] Colorado does not require similar disclosures for persons who gather signatures to place candidates on the ballot. See generally Colo. Rev. Stat. § 1-4-905 (1998) (regulations governing candidate-petition circulators).

decision in *Buckley* v. *Valeo,* 424 U. S. 1 (1976) *(per curiam).* In that decision, we stated that "exacting scrutiny" is necessary when compelled disclosure of campaign-related payments is at issue. See *id.,* at 64–65. We nevertheless upheld, as substantially related to important governmental interests, the recordkeeping, reporting, and disclosure provisions of the Federal Election Campaign Act of 1971, 86 Stat. 3, as amended, 88 Stat. 1263, 2 U. S. C. § 431 *et seq.* (1970 ed., Supp. IV). See 424 U. S., at 66–68, 84. We explained in *Buckley* that disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent," thereby aiding electors in evaluating those who seek their vote. *Id.,* at 66 (internal quotation marks omitted). We further observed that disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.,* at 67; see also *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment").

Mindful of *Buckley,* the Tenth Circuit did not upset Colorado's disclosure requirements "as a whole." But see *post,* at 233 (REHNQUIST, C. J., dissenting). Notably, the Court of Appeals upheld the State's requirements for disclosure of *payors,* in particular, proponents' names and the total amount they have spent to collect signatures for their petitions. See 120 F. 3d, at 1104–1105. In this regard, the State and supporting *amici* stress the importance of disclosure as a control or check on domination of the initiative process by affluent special interest groups. See Reply Brief 15 ("[T]here are increasingly more initiatives that are the product of large monied interests."); Brief for Council of State Governments et al. as *Amici Curiae* 3 ("Today the initiative and referendum process is dominated by money and professional firms."). Disclosure of the names of initiative sponsors, and of the amounts they have spent gathering

support for their initiatives, responds to that substantial state interest. See 870 F. Supp., at 1003 ("What is of interest is the payor, not the payees."); cf. this Court's Rule 37.6 (requiring disclosure of "every person or entity ... who made a monetary contribution to the preparation or submission of the brief").

Through the disclosure requirements that remain in place, voters are informed of the source and amount of money spent by proponents to get a measure on the ballot; in other words, voters will be told "who has proposed [a measure]," and "who has provided funds for its circulation." See *post*, at 224 (O'CONNOR, J., concurring in judgment in part and dissenting in part). The added benefit of revealing the names of paid circulators and amounts paid to each circulator, the lower courts fairly determined from the record as a whole, is hardly apparent and has not been demonstrated.[22]

We note, furthermore, that ballot initiatives do not involve the risk of *"quid pro quo"* corruption present when money is paid to, or for, candidates. See *Meyer*, 486 U. S., at 427–428 (citing *First-Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue.")); *McIntyre*, 514 U. S., at 352, n. 15. In addition, as we stated in *Meyer*, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." 486 U. S., at 427. Finally, absent evidence to the contrary, "we are not prepared to assume that a professional circulator—whose qualifications for similar future assignments may

---

[22] JUSTICE O'CONNOR states that "[k]nowing the names of paid circulators and the amounts paid to them [will] allo[w] members of the public to evaluate the sincerity or, alternatively, the potential bias of any circulator that approaches them." *Post*, at 224 (opinion concurring in judgment in part and dissenting in part). It is not apparent why or how this is so, for the reports containing the names of paid circulators would be filed with the Secretary of State and would not be at hand at the moment the circulators "approac[h]."

well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot." *Id.*, at 426.[23]

In sum, we agree with the Court of Appeals appraisal: Listing paid circulators and their income from circulation "forc[es] paid circulators to surrender the anonymity enjoyed by their volunteer counterparts," 120 F. 3d, at 1105;[24] no more than tenuously related to the substantial interests disclosure serves, Colorado's reporting requirements, to the extent that they target paid circulators, "fai[l] exacting scrutiny," *ibid.*

## VI

Through less problematic measures, Colorado can and does meet the State's substantial interests in regulating the ballot-initiative process. Colorado aims to protect the integrity of the initiative process, specifically, to deter fraud

---

[23] While testimony in the record suggests that "occasional fraud in Colorado's petitioning process" involved paid circulators, it does not follow like the night the day that "paid circulators are more likely to commit fraud and gather false signatures than other circulators." See *post*, at 225 (O'CONNOR, J., concurring in judgment in part and dissenting in part). Far from making any ultimate finding to that effect, the District Court determined that neither the State's interest in preventing fraud, nor its interest in informing the public concerning the "financial resources . . . available to [initiative proponents]" or the "special interests" supporting a ballot measure, is "significantly advanced by disclosure of the names and addresses of each person paid to circulate any section of [a] petition." 870 F. Supp., at 1003. Such disclosure in proponents' reports, the District Court also observed, risked exposing the paid circulators "to intimidation, harassment and retribution in the same manner as the badge requirement." *Ibid.*

[24] Because the disclosure provisions target only paid circulators and require disclosure of the income from circulation each receives, the disclosure reports are of course "[d]istinguishable from the affidavit," *post*, at 221 (O'CONNOR, J., concurring in judgment in part and dissenting in part), which must be completed by both paid and volunteer circulators, and does not require disclosure of the amount paid individually to a circulator.

and diminish corruption. See Brief for Petitioner 24, 42, 45; Reply Brief 13, 14, 17. To serve that important interest, as we observed in *Meyer*, Colorado retains an arsenal of safeguards. See 486 U. S., at 426–427; 120 F. 3d, at 1103, 1105; see, *e. g.*, Colo. Rev. Stat. § 1–40–130(1)(b) (1998) (making it criminal to forge initiative-petition signatures); § 1–40–132(1) (initiative-petition section deemed void if circulator has violated any provision of the laws governing circulation). To inform the public "where [the] money comes from," *Buckley*, 424 U. S., at 66 (internal quotation marks omitted), we reiterate, the State legitimately requires sponsors of ballot initiatives to disclose who pays petition circulators, and how much. See *supra*, at 202–203.

To ensure grass roots support, Colorado conditions placement of an initiative proposal on the ballot on the proponent's submission of valid signatures representing five percent of the total votes cast for all candidates for Secretary of State at the previous general election. Colo. Const., Art. V, § 1(2); Colo. Rev. Stat. § 1–40–109(1) (1998); see *Meyer*, 486 U. S., at 425–426; 120 F. 3d, at 1105. Furthermore, in aid of efficiency, veracity, or clarity, Colorado has provided for an array of process measures not contested here by ACLF. These measures prescribe, *inter alia*, a single subject per initiative limitation, Colo. Rev. Stat. § 1–40–106.5(1)(a) (1998), a signature verification method, § 1–40–116, a large, plain-English notice alerting potential signers of petitions to the law's requirements, § 1–40–110(1), and the text of the affidavit to which all circulators must subscribe, § 1–40–111(2).

\* \* \*

For the reasons stated, we conclude that the Tenth Circuit correctly separated necessary or proper ballot-access controls from restrictions that unjustifiably inhibit the circulation of ballot-initiative petitions. Therefore, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE THOMAS, concurring in the judgment.

When considering the constitutionality of a state election regulation that restricts core political speech or imposes "severe burdens" on speech or association, we have generally required that the law be narrowly tailored to serve a compelling state interest. But if the law imposes "lesser burdens," we have said that the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions. The Court today appears to depart from this now-settled approach. In my view, Colorado's badge, registration, and reporting requirements each must be evaluated under strict scrutiny. Judged by that exacting standard, I agree with the majority that each of the challenged regulations violates the First and Fourteenth Amendments, and accordingly concur only in the judgment.

I

States, of course, must regulate their elections to ensure that they are conducted in a fair and orderly fashion. See, e. g., *Timmons* v. *Twin Cities Area New Party*, 520 U. S. 351, 358 (1997); *Burdick* v. *Takushi*, 504 U. S. 428, 433 (1992). But such regulations often will directly restrict or otherwise burden core political speech and associational rights. To require that every voting, ballot, and campaign regulation be narrowly tailored to serve a compelling interest "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Ibid.* Consequently, we have developed (although only recently) a framework for assessing the constitutionality, under the First and Fourteenth Amendments, of state election laws. When a State's rule imposes severe burdens on speech or association, it must be narrowly tailored to serve a compelling interest; lesser burdens trigger less exacting review, and a State's important regulatory interests are typically enough to justify reasonable restrictions. *Timmons, supra,* at 358–359; *Burdick,*

*supra*, at 434; *Anderson* v. *Celebrezze*, 460 U. S. 780, 788–790 (1983).

Predictability of decisions in this area is certainly important, but unfortunately there is no bright line separating severe from lesser burdens. When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny and required that the legislation be narrowly tailored to serve a compelling governmental interest. See, *e. g.*, *Burson* v. *Freeman*, 504 U. S. 191, 198 (1992) (Tennessee law prohibiting solicitation of voters and distribution of campaign literature within 100 feet of the entrance of a polling place); *Brown* v. *Hartlage*, 456 U. S. 45, 53–54 (1982) (Kentucky's regulation of candidate campaign promises); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978) (Massachusetts law prohibiting certain business entities from making expenditures for the purpose of affecting referendum votes).

Even where a State's law does not directly regulate core political speech, we have applied strict scrutiny. For example, in *Meyer* v. *Grant*, 486 U. S. 414 (1988), we considered a challenge to Colorado's law making it a felony to pay initiative petition circulators. We applied strict scrutiny because we determined that initiative petition circulation "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.*, at 421. In *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290 (1981), we subjected to strict scrutiny a city ordinance limiting contributions to committees formed to oppose ballot initiatives because it impermissibly burdened association and expression. *Id.*, at 294.

When core political speech is at issue, we have ordinarily applied strict scrutiny without first determining that the State's law severely burdens speech. Indeed, in *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995), the Court suggested that we only resort to our severe/lesser burden

framework if a challenged election law regulates "the mechanics of the electoral process," not speech. *Id.*, at 345; but see *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 222–223 (1989) (first determining that California's prohibition on primary endorsements by the official governing bodies of political parties burdened speech and association and then applying strict scrutiny). I suspect that when regulations of core political speech are at issue, it makes little difference whether we determine burden first because restrictions on core political speech so plainly impose a "severe burden."

When an election law burdens voting and associational interests, our cases are much harder to predict, and I am not at all sure that a coherent distinction between severe and lesser burdens can be culled from them. For example, we have subjected to strict scrutiny Connecticut's requirement that voters in any party primary be registered members of that party because it burdened the "associational rights of the Party and its members." *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 217 (1986). We similarly treated California's laws dictating the organization and composition of official governing bodies of political parties, limiting the term of office of a party chair, and requiring that the chair rotate between residents of northern and southern California because they "burden[ed] the associational rights of political parties and their members," *Eu, supra*, at 231. In *Storer* v. *Brown*, 415 U. S. 724 (1974), we applied strict scrutiny to California's law denying a ballot position to independent candidates who had a registered affiliation with a qualified political party within a year of the preceding primary election, apparently because it "substantially" burdened the rights to vote and associate. *Id.*, at 729, 736.[1] And in *Nor-*

---

[1] Although we did not explicitly apply strict scrutiny in *Storer*, we said that the State's interest was "not only permissible, but compelling," and that the device the State chose was "an essential part of its overall mechanism." 415 U. S., at 736.

*man* v. *Reed,* 502 U. S. 279 (1992), we determined that Illinois' regulation of the use of party names and its law establishing signature requirements for nominating petitions severely burdened association by limiting new parties' access to the ballot, and held both challenged laws, as construed by the State Supreme Court, unconstitutional because they were not narrowly tailored. *Id.,* at 288–290, 294. By contrast, we determined that Minnesota's law preventing a candidate from appearing on the ballot as the choice of more than one party burdened a party's access to the ballot and its associational rights, but not severely, and upheld the ban under lesser scrutiny. *Timmons,* 520 U. S., at 363. We likewise upheld Hawaii's prohibition on write-in voting, which imposed, at most, a "very limited" burden on voters' freedom of choice and association. *Burdick,* 504 U. S., at 437.

## II

Colorado argues that its badge, registration, and reporting requirements impose "lesser" burdens, and consequently, each ought to be upheld as serving important state interests. I cannot agree.

## A

The challenged badge requirement, Colo. Rev. Stat. § 1–40–112(2) (1998), directly regulates the content of speech. The State requires that all petition circulators disclose, at the time they deliver their political message, their names and whether they were paid or unpaid. Therefore, the regulation must be evaluated under strict scrutiny. Moreover, the category of burdened speech is defined by its content— Colorado's badge requirement does not apply to those who circulate candidate petitions, only to those who circulate initiative or referendum proposals. See generally § 1–4–905 (candidate petition circulation requirements). Content-based regulation of speech typically must be narrowly tailored to a compelling state interest. See, *e. g., Boos* v.

*Barry*, 485 U. S. 312, 321 (1988). The State's dominant justification for its badge requirement is that it helps the public to identify, and the State to apprehend, petition circulators who perpetrate fraud. Even assuming that this is a compelling interest, plainly, this requirement is not narrowly tailored. It burdens all circulators, whether they are responsible for committing fraud or not. In any event, the State has failed to satisfy its burden of demonstrating that fraud is a real, rather than a conjectural, problem. See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 664 (1994); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 647 (1996) (THOMAS, J., concurring in judgment and dissenting in part).[2]

## B

Although Colorado's registration requirement, Colo. Rev. Stat. § 1–40–112(1) (1998), does not *directly* regulate speech, it operates in the same fashion that Colorado's prohibition on paid circulators did in *Meyer*—the requirement reduces the voices available to convey political messages. We unanimously concluded in *Meyer* that initiative petition circulation was core political speech. 486 U. S., at 421–422. Colorado's law making it a felony to pay petition circulators burdened that political expression, we said, because it reduced the number of potential speakers. That reduction limited the size of the audience that initiative proponents and circulators might reach, which in turn made it less likely that initiative proposals would garner the signatures necessary to qualify

---

[2] The majority is correct to note, *ante*, at 200, that the Tenth Circuit declined to address whether Colorado's requirement that the badge disclose whether a circulator is paid or a volunteer, and if paid, the name and telephone number of the payer, would be constitutionally permissible standing *alone*. Nevertheless, the District Court invalidated § 1–40–112(2) in its entirety, *American Constitutional Law Foundation, Inc.* v. *Meyer*, 870 F. Supp. 995, 1005 (Colo. 1994), and the Court of Appeals affirmed that decision in full. *American Constitutional Law Foundation, Inc.* v. *Meyer*, 120 F. 3d 1092, 1096 (CA10 1997).

for the ballot. *Id.*, at 422–423. I see no reason to revisit our earlier conclusion. The aim of a petition is to secure political change, and the First Amendment, by way of the Fourteenth Amendment, guards against the State's efforts to restrict free discussions about matters of public concern.[3]

Colorado primarily defends its registration requirement on the ground that it ensures that petition circulators are residents, which permits the State to more effectively enforce its election laws against those who violate them.[4] The Tenth Circuit assumed, and so do I, that the State has a compelling interest in ensuring that all circulators are residents. Even so, it is clear, as the Court of Appeals decided, that the registration requirement is not narrowly tailored. A large number of Colorado's residents are not registered voters, as the majority points out, *ante*, at 193, and the State's asserted interest could be more precisely achieved through a residency requirement.[5]

---

[3] There is anecdotal evidence in the briefs that circulators do not discuss the merits of a proposed change by initiative in any great depth. Indeed, National Voter Outreach, Inc., an *amicus curiae* in support of respondents and, according to its statement of interest, the largest organizer of paid petition circulation drives in the United States, describes most conversations between circulator and prospective petition signer as "brief." Brief for National Voter Outreach, Inc., as *Amicus Curiae* 21. It gives an example of the typical conversation: "'Here, sign this. It will really [tick off California Governor] Pete Wilson.'" *Id.*, at 21, n. 17. In my view, the level of scrutiny cannot turn on the content or sophistication of a political message. Cf. *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 640 (1996) ("Even a pure message of support, unadorned with reasons, is valuable to the democratic process").

[4] Colorado's law requires that petition circulators be registered electors, Colo. Rev. Stat. §1–40–112(1) (1998), and while one must reside in Colorado in order to be a registered voter, §1–2–101(1)(b), Colorado does not have a separate residency requirement for petition circulators at this time.

[5] Whatever the merit of the views expressed by THE CHIEF JUSTICE, *post*, at 227, 230 (dissenting opinion), the State did little more than mention in passing that it had an interest in having its own voters decide what issues should go on the ballot. See Brief for Petitioner 31.

## C

The District Court and the Court of Appeals both suggested that by forcing proponents to identify paid circulators by name, the reports made it less likely that persons would want to circulate petitions. Therefore, both concluded, the reporting requirement had a chilling effect on core political speech similar to the one we recognized in *Meyer*. *American Constitutional Law Foundation, Inc.* v. *Meyer*, 120 F. 3d 1092, 1096 (CA10 1997); *American Constitutional Law Foundation, Inc.* v. *Meyer*, 870 F. Supp. 995, 1003 (Colo. 1994). The District Court additionally determined that preparation of the required monthly reports was burdensome for and involved additional expense to those supporting an initiative petition. *Ibid.*

In my view, the burdens that the reporting requirement imposes on circulation are too attenuated to constitute a "severe burden" on core political speech. However, "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley* v. *Valeo*, 424 U. S. 1, 64 (1976) *(per curiam)*. In *Buckley*, because the disclosure requirements of the Federal Election Campaign Act of 1971 encroached on associational rights, we required that they pass a "strict test." *Id.*, at 66. The same associational interests are burdened by the State's reporting requirements here, and they must be evaluated under strict scrutiny.

Colorado argues that the "essential purpose" of the reports is to identify circulators. Brief for Petitioner 44. It also claims that its required reports are designed to provide "the press and the voters of Colorado a more complete picture of how money is being spent to get a measure on the ballot." *Ibid.* Even assuming that Colorado has a compelling interest in identifying circulators, its law does not serve that interest. The State requires that proponents identify only the names of *paid* circulators, not *all* circulators. The interest in requiring a report as to the money paid to each

circulator by name, as the majority points out, *ante*, at 201, has not been demonstrated.

The State contends that its asserted interest in providing the press and the electorate with information as to how much money is spent by initiative proponents to advance a particular measure is similar to the governmental interests in providing the electorate with information about how money is spent by a candidate and where it comes from, and in deterring actual corruption and avoiding the appearance of corruption that we recognized in *Buckley, supra*, at 66–67. However, we have suggested that ballot initiatives and candidate elections involve different considerations. *Bellotti*, 435 U. S., at 791–792 ("[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. . . . [I]f there be any danger that the people cannot evaluate the information and arguments advanced by [one source], it is a danger contemplated by the Framers of the First Amendment"); see also *Citizens Against Rent Control*, 454 U. S., at 296–298. Indeed, we recognized in *Meyer* that "the risk of improper conduct . . . is more remote at the petition stage of an initiative." 486 U. S., at 427. Similarly, I would think, at the very least, the State's interest in informing the public of the financial interests behind an initiative proposal is not compelling during the petitioning stage.

As it stands after the lower court decisions, proponents must disclose the amount paid per petition signature and the total amount paid to each circulator, without identifying each circulator, at the time the petition is filed. Monthly disclosures are no longer required.[6] Because the respondents did

---

[6] The Court of Appeals did not specifically identify any constitutional problem with the monthly reports to the extent that they require disclosure of proponents' names and proposed ballot measures for which persons were paid to circulate petitions. But the District Court invalidated the entire monthly reporting requirement, 870 F. Supp., at 1005, and the Court of Appeals affirmed its decision in full. See 120 F. 3d, at 1096.

not sufficiently brief the question, I am willing to assume, for purposes of this opinion, that Colorado's interest in having this information made available to the press and its voters—before the initiative is voted upon, but not during circulation—is compelling. The reporting provision as modified by the courts below ensures that the public receives information demonstrating the financial support behind an initiative proposal before voting.

I recognize that in *Buckley*, although the Court purported to apply strict scrutiny, its formulation of that test was more forgiving than the traditional understanding of that exacting standard. The Court merely required that the disclosure provisions have a "substantial relation," 424 U. S., at 64, to a "substantial" government interest, *id.*, at 68.[7] (The majority appears to dilute *Buckley*'s formulation even further, stating that Colorado's reporting requirement must be "substantially related to important governmental interests." *Ante*, at 202.) To the extent that *Buckley* suggests that we should apply a relaxed standard of scrutiny, it is inconsistent with our state election law cases that require the application of traditional strict scrutiny whenever a state law "severely burdens" association, and I would not adhere to it. I would nevertheless decide that the challenged portions of Colorado's disclosure law are unconstitutional as evaluated under the *Buckley* standard.

\* \* \*

To conclude, I would apply strict scrutiny to each of the challenged restrictions, and would affirm the judgment of

---

[7] I have previously noted that the Court in *Buckley* seemed more forgiving in its review of the contribution provisions than it was with respect to the expenditure rules at issue, even though we purported to strictly scrutinize both. *Colorado Republican*, 518 U. S., at 640, n. 7 (THOMAS, J., concurring in judgment and dissenting in part).

the Court of Appeals as to each of the three provisions before us. As the majority would apply different reasoning, I concur only in the Court's judgment.

JUSTICE O'CONNOR, with whom JUSTICE BREYER joins, concurring in the judgment in part and dissenting in part.

Petition circulation undoubtedly has a significant political speech component. When an initiative petition circulator approaches a person and asks that person to sign the petition, the circulator is engaging in "interactive communication concerning political change." *Meyer* v. *Grant*, 486 U. S. 414, 422 (1988). It was the imposition of a direct and substantial burden on this one-on-one communication that concerned us in *Meyer* v. *Grant*. To address this concern, we held in that case that regulations directly burdening the one-on-one, communicative aspect of petition circulation are subject to strict scrutiny. *Id.*, at 420.

Not all circulation-related regulations target this aspect of petition circulation, however. Some regulations govern the electoral process by directing the manner in which an initiative proposal qualifies for placement on the ballot. These latter regulations may indirectly burden speech but are a step removed from the communicative aspect of petitioning and are necessary to maintain an orderly electoral process. Accordingly, these regulations should be subject to a less exacting standard of review.

In this respect, regulating petition circulation is similar to regulating candidate elections. Regulations that govern a candidate election invariably burden to some degree one's right to vote and one's right to associate for political purposes. Such restrictions are necessary, however, "if [elections] are to be fair and honest." *Storer* v. *Brown*, 415 U. S. 724, 730 (1974). To allow for regulations of this nature without overly burdening these rights, we have developed a flexible standard to review regulations of the electoral process.

The Court succinctly described this standard in *Burdick* v. *Takushi*, 504 U. S. 428 (1992):

> "[W]hen [First and Fourteenth Amendment] rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance.  But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*, at 434 (internal quotation marks and citations omitted).

Applying this test, in *Burdick,* we upheld as reasonable Hawaii's prohibition on write-in voting, holding that it imposed only a limited burden upon the constitutional rights of voters.  See *id.,* at 433–441.  See also *Timmons* v. *Twin Cities Area New Party,* 520 U. S. 351, 362–370 (1997) (upholding Minnesota law that banned fusion candidacies on the ground that the State had asserted a "sufficiently weighty" interest).  The application of this flexible standard was not without precedent.  Prior to *Burdick,* the Court applied a test akin to rational review to regulations that governed only the administrative aspects of elections.  See *Rosario* v. *Rockefeller,* 410 U. S. 752, 756–762 (1973) (upholding requirement that voters enroll as members of a political party prior to voting in a primary election on the ground that the regulation did not impose an onerous burden and advanced a legitimate state interest).

Under the *Burdick* approach, the threshold inquiry is whether Colorado's regulations directly and substantially burden the one-on-one, communicative aspect of petition circulation or whether they primarily target the electoral process, imposing only indirect and less substantial burdens on communication.  If the former, the regulation should be subject to strict scrutiny.  If the latter, the regulation should be subject to review for reasonableness.

## I

I agree with the Court that requiring petition circulators to wear identification badges, specifically name badges, see Colo. Rev. Stat. § 1-40-112(2)(b) (1998), should be subject to, and fails, strict scrutiny. Requiring petition circulators to reveal their names while circulating a petition directly regulates the core political speech of petition circulation. The identification badge introduces into the one-on-one dialogue of petition circulation a message the circulator might otherwise refrain from delivering, and the evidence shows that it deters some initiative petition circulators from disseminating their messages. Under the logic of *Meyer*, the regulation is subject to more exacting scrutiny. As explained by the Court, see *ante*, at 198-200, Colorado's identification badge requirement cannot survive this more demanding standard of review because the requirement is not narrowly tailored to satisfy Colorado's interest in identifying and apprehending petition circulators who engage in misconduct. I also agree that whether Colorado's other badge requirement—that the badges identify initiative petition circulators as paid or volunteer—is constitutional is a question that the court below did not resolve, and this issue is not properly before us. See *ante*, at 197. Accordingly, like the Court, I do not address it.

## II

Unlike the majority, however, I believe that the requirement that initiative petition circulators be registered voters, see Colo. Rev. Stat. § 1-40-112(1) (1998), is a permissible regulation of the electoral process. It is indeed a classic example of this type of regulation. We have upheld analogous restrictions on qualifications to vote in a primary election and on candidate eligibility as reasonable regulations of the electoral process. See *Rosario* v. *Rockefeller, supra,* at 756-762 (upholding qualifications to vote in primary); *Storer* v. *Brown, supra,* at 728-737 (upholding candidate eligibility

requirement). As THE CHIEF JUSTICE observes, Colorado's registration requirement parallels the requirements in place in at least 19 States and the District of Columbia that candidate petition circulators be electors, see *post*, at 232, and the requirement of many States that candidates certify that they are registered voters.* Like these regulations, the registration requirement is a neutral qualification for participation in the petitioning process.

When one views the registration requirement as a neutral qualification, it becomes apparent that the requirement only indirectly and incidentally burdens the communicative aspects of petition circulation. By its terms, the requirement does not directly prohibit otherwise qualified initiative petition circulators from circulating petitions. Cf. *Rosario* v. *Rockefeller, supra,* at 758 (holding that time limits on enrollment in political parties did not violate the right of association because individuals were not prohibited from enrolling in parties). Moreover, as THE CHIEF JUSTICE illustrates in his dissent, this requirement can be satisfied quite easily. See *post*, at 228. The requirement, indeed, has been in effect in Colorado since 1980, see *American Constitutional Law Foundation, Inc.* v. *Meyer,* 870 F. Supp. 995, 999 (Colo. 1994), with no apparent impact on the ability of groups to circulate petitions, see 2 Tr. 159 (testimony of Donetta Davidson that the number of initiative proposals placed on the ballot has increased over the past few years).

In this way, the registration requirement differs from the statute held unconstitutional in *Meyer.* There, we reviewed a statute that made it unlawful to pay petition circulators, see *Meyer* v. *Grant*, 486 U. S., at 417, and held that the statute directly regulated and substantially burdened speech by

---

*See, *e. g.,* Va. Const., Art. V, §3; Cal. Elec. Code Ann. §201 (West Special Pamphlet 1996); Ind. Stat. Ann. §3-8-5-14 (1998); Mass. Gen. Laws Ann., ch. 53, §9 (West Supp. 1998); Nev. Rev. Stat. Ann. §293.180 (1997); N. H. Rev. Stat. Ann. §655:28 (1996); N. J. Stat. Ann. §40:45-8 (West 1991); N. C. Gen. Stat. §163-323 (Supp. 1997); Okla. Stat., Tit. 26, §5-111 (1997).

excluding from petition circulation a class of actual circulators that were necessary "to obtain the required number of signatures within the allotted time." *Ibid.* That is, the statute directly silenced voices that were necessary, and "able and willing" to convey a political message. *Id.*, at 422–423, and n. 6. In contrast, the registration requirement does not effect a ban on an existing class of circulators or, by its terms, silence those who are "able and willing" to circulate ballot initiative petitions. Indeed, it does not appear that the parties to this litigation needed unregistered but voter-eligible individuals to disseminate their political messages. Cf. *id.*, at 417.

The respondents have offered only slight evidence to suggest that the registration requirement negatively affects the one-on-one, communicative aspect of petition circulation. In particular, the respondents argue that the registration requirement burdens political speech because some otherwise-qualified circulators do not register to vote as a form of political protest. See *ante*, at 195–196. Yet the existence and severity of this burden is not as clearly established in the record as the respondents, or the Court, suggests.

For example, witness Jack Hawkins, whose testimony the Court cites for the proposition that "the choice not to register implicates political thought and expression," see *ante*, at 195, did not testify that anyone failed to register to vote as a political statement. He responded "[y]es, that's true" to the leading question "are there individuals who would circulate your petition who are non-registered voters because of their political choice?" 1 Tr. 14. But he went on to explain this "political choice" as follows:

> "They have interesting views of why they don't want to register to vote. *They're under a misconception that they won't be called for jury duty if they're not registered to vote and they're really concerned about being a jurist,* but in Colorado you can be a jurist if you drive a car or pay taxes or anything else. So, they're under a

misconception, but I can't turn them around on that."
*Id.,* at 15–16 (emphasis added).

Likewise, witness Jon Baraga, who testified that some potential circulators are not registered to vote because they feel the political process is not responsive to their needs, see *ante,* at 196, went on to testify that many of the same people would register to vote if an initiative they supported were placed on the ballot. See 1 Tr. 58. Considered as a whole, this testimony does not establish that the registration requirement substantially burdens alternative forms of political expression.

Because the registration requirement indirectly and incidentally burdens the one-on-one, communicative aspect of petition circulation, *Burdick* requires that it advance a legitimate state interest to be a reasonable regulation of the electoral process. Colorado maintains that the registration requirement is necessary to enforce its laws prohibiting circulation fraud and to guarantee the State's ability to exercise its subpoena power over those who violate these laws, see *ante,* at 196, two patently legitimate interests. See, *e. g., Timmons* v. *Twin Cities Area New Party,* 520 U. S., at 366–367; *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 636–637 (1980). In the past, Colorado has had difficulty enforcing its prohibition on circulation fraud, in particular its law against forging petition signatures, because violators fled the State. See 2 Tr. 115 (testimony of Donetta Davidson). Colorado has shown that the registration requirement is an easy and a verifiable way to ensure that petition circulators fall under the State's subpoena power. See Tr. of Oral Arg. 14; see also Appellee's Supplemental App. in Nos. 94–1576 and 94–1581 (CA10), p. 268 (describing requirement that signatories be registered voters as necessary for verification of signatures). For these reasons, I would uphold the requirement as a reasonable regulation of Colorado's electoral process.

## III

Most disturbing is the Court's holding that Colorado's disclosure provisions are partially unconstitutional. Colorado requires that ballot-initiative proponents file two types of reports: monthly reports during the period of circulation and a final report when the initiative petition is submitted. See Colo. Rev. Stat. § 1–40–121 (1998). The monthly reports must include the names of paid circulators, their business and residential addresses, and the amount of money paid and owed to each paid circulator during the relevant month. See § 1–40–121(2). The final report also must include the paid circulators' names and addresses, as well as the total amount paid to each circulator. See § 1–40–121(1). The Tenth Circuit invalidated the reports to the extent they revealed this information. See *ante*, at 201. The Court affirms this decision, without expressing an opinion on the validity of the reports to the extent they reveal other information, on the ground that forcing the proponents of ballot initiatives to reveal the identities of their paid circulators is tenuously related to the interests disclosure serves and impermissibly targets paid circulators. See *ante*, at 202–203. I, however, would reverse the Tenth Circuit on the ground that Colorado's disclosure provision is a reasonable regulation of the electoral process.

Colorado's disclosure provision is a step removed from the one-on-one, communicative aspects of petition circulation, and it burdens this communication in only an incidental manner. Like the mandatory affidavit that must accompany every set of signed petitions, the required disclosure reports "revea[l] the name of the petition circulator and [are] public record[s] . . . [, but are] separated from the moment the circulator speaks," see *ante*, at 198. This characteristic indeed makes the disclosure reports virtually indistinguishable from the affidavit requirement, which the Court suggests is a permissible regulation of the electoral process, see *ante*, at 200, and similarly lessens any chilling effect the reports might

have on speech, see *ante*, at 198–199 (observing that injury to speech is heightened when disclosure is made at the moment of speech). If anything, the disclosure reports burden speech less directly than the affidavits because the latter are completed by the petition circulator, while the former are completed by the initiative proponent and thus are a step removed from petition circulation. In fact, the Court does not suggest that there is any record evidence tending to show that such remote disclosure will deter the circulation of initiative petitions. To the extent the disclosure requirements burden speech, the burden must be viewed as incremental and insubstantial in light of the affidavit requirement, which also reveals the identity of initiative petition circulators.

As a regulation of the electoral process with an indirect and insignificant effect on speech, the disclosure provision should be upheld so long as it advances a legitimate government interest. Colorado's asserted interests in combating fraud and providing the public with information about petition circulation are surely sufficient to survive this level of review. These are among the interests we found to be substantial in *Buckley* v. *Valeo.* See 424 U. S. 1, 67, 68 (1976) *(per curiam)* (holding that the Government has a substantial interest in requiring candidates to disclose the sources of campaign contributions to provide the electorate with information about "the interests to which a candidate is most likely to be responsive," to "deter actual corruption and avoid the appearance of corruption," and "to detect violations of the contribution limitations"). Moreover, it is scarcely debatable that, as a general matter, financial disclosure effectively combats fraud and provides valuable information to the public. We have recognized that financial disclosure requirements tend to discourage those who are subject to them from engaging in improper conduct, and that "[a] public armed with information . . . is better able to detect" wrongdoing. See *id.*, at 67; see also *Grosjean* v. *Amer-*

*ican Press Co.,* 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). " 'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " *Buckley* v. *Valeo, supra,* at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933)). "[I]n the United States, for half a century compulsory publicity of political accounts has been the cornerstone of legal regulation. Publicity is advocated as an automatic regulator, inducing self-discipline among political contenders and arming the electorate with important information." H. Alexander & B. Haggerty, The Federal Election Campaign Act: After a Decade of Political Reform 37 (1981). " '[T]otal disclosure' " has been recognized as the " 'essential cornerstone' " to effective campaign finance reform, *id.,* at 39, and "fundamental to the political system," H. Alexander, Financing Politics: Money, Elections, and Political Reform 164 (4th ed. 1992).

In light of these many and substantial benefits of disclosure, we have upheld regulations requiring disclosure and reporting of amounts spent by candidates for election, amounts contributed to candidates, and the names of contributors, see *Buckley* v. *Valeo,* 424 U. S., at 60–84, while holding that the First Amendment protects the right of the political speaker to spend his money to amplify his speech, see *id.,* at 44–59. Indeed, laws requiring the disclosure of the names of contributors and the amounts of their contributions are common to all States and the Federal Government. See *id.,* at 62–64 (describing disclosure provisions of Federal Election Campaign Act of 1971); Alexander, Financing Politics, *supra,* at 135 ("All fifty states have some disclosure requirements, and all except two [South Carolina and Wyoming] call for both pre- and post-election reporting of contributions and expenditures"). Federal disclosure laws were first enacted in 1910, and early laws, like Colorado's current provision, required the disclosure of the names of contributors and the

recipients of expenditures. See *Buckley* v. *Valeo,* 424 U. S., at 61. Such public disclosure of the amounts and sources of political contributions and expenditures assists voters in making intelligent and knowing choices in the election process and helps to combat fraud.

The recognized benefits of financial disclosure are equally applicable in the context of petition circulation. Disclosure deters circulation fraud and abuse by encouraging petition circulators to be truthful and self-disciplined. See generally *id.,* at 67. The disclosure required here advances Colorado's interest in law enforcement by enabling the State to detect and to identify on a timely basis abusive or fraudulent circulators. Moreover, like election finance reporting generally, Colorado's disclosure reports provide facts useful to voters who are weighing their options. Members of the public deciding whether to sign a petition or how to vote on a measure can discover who has proposed it, who has provided funds for its circulation, and to whom these funds have been provided. Knowing the names of paid circulators and the amounts paid to them also allows members of the public to evaluate the sincerity or, alternatively, the potential bias of any circulator that approaches them. In other words, if one knows a particular circulator is well paid, one may be less likely to believe the sincerity of the circulator's statements about the initiative proposal. The monthly disclosure reports are public records available to the press and public, see Brief for Petitioner 44, are "contemporaneous with circulation," *American Constitutional Law Foundation, Inc.* v. *Meyer,* 120 F. 3d 1092, 1105 (CA10 1997), and are more accessible than the other "masses of papers filed with the petitions," see 870 F. Supp., at 1004.

It is apparent from the preceding discussion that, to combat fraud and to inform potential signatories in a timely manner, disclosure must be made at the time people are being asked to sign petitions and before any subsequent vote on a measure that qualifies for the ballot. It is, indeed, during

this period that the need to deter fraud and to inform the public of the forces motivating initiative petitions "is likely to be at its peak . . . ; [this] is the time when improper influences are most likely to be brought to light." *Buckley* v. *Valeo, supra,* at 68, n. 82. Accordingly, the monthly reports, which are disseminated during the circulation period and are available to the press, see Brief for Petitioner 44, uniquely advance Colorado's interests. The affidavit requirement is not an effective substitute because the affidavits are not completed until after all signatures have been collected and thus after the time that the information is needed. See Colo. Rev. Stat. § 1–40–111(2) (1998) ("Any signature added to a section of a petition after the affidavit has been executed shall be invalid"). In addition, the public's access to the affidavits is generally more restricted than its access to monthly disclosure reports, for as the District Court found, the public will have "greater difficulty in finding [the] names and addresses [of petition circulators] in the masses of papers filed with the petitions as compared with the monthly reports." 870 F. Supp., at 1004.

To be sure, Colorado requires disclosure of financial information about only paid circulators. But, contrary to the Court's assumption, see *ante,* at 203–204, this targeted disclosure is permissible because the record suggests that paid circulators are more likely to commit fraud and gather false signatures than other circulators. The existence of occasional fraud in Colorado's petitioning process is documented in the record. See 2 Tr. 197–198 (testimony of retired FBI agent Theodore P. Rosack); *id.,* at 102, 104–116 (testimony of Donetta Davidson). An elections officer for the State of Colorado testified that only paid circulators have been involved in recent fraudulent activity, see *id.,* at 150–151 and 161 (testimony of Donetta Davidson); see also *id.,* at 197–198 (testimony of Theodore P. Rosack) (describing recent investigation of fraud in which only paid circulators were implicated). Likewise, respondent William C. Orr, the executive

director of the American Constitutional Law Foundation, Inc., while examining a witness, explained to the trial court that "volunteer organizations, they're self-policing and there's not much likelihood of fraud. . . . Paid circulators are perhaps different." *Id.*, at 208–209.

Because the legitimate interests asserted by Colorado are advanced by the disclosure provision and outweigh the incidental and indirect burden that disclosure places on political speech, I would uphold the provision as a reasonable regulation of the electoral process. Colorado's interests are more than legitimate, however. We have previously held that they are substantial. See *Buckley* v. *Valeo, supra,* at 67, 68. Therefore, even if I thought more exacting scrutiny were required, I would uphold the disclosure requirements.

Because I feel the Court's decision invalidates permissible regulations that are vitally important to the integrity of the political process, and because the decision threatens the enforceability of other important and permissible regulations, I concur in the judgment only in part and dissent in part.

CHIEF JUSTICE REHNQUIST, dissenting.

The Court today invalidates a number of state laws designed to prevent fraud in the circulation of candidate petitions and to ensure that local issues of state law are decided by local voters, rather than by out-of-state interests. Because I believe that Colorado can constitutionally require that those who circulate initiative petitions *to* registered voters actually *be* registered voters themselves, and because I believe that the Court's contrary holding has wide-reaching implication for state regulation of elections generally, I dissent.

I

Ballot initiatives of the sort involved in this case were a central part of the Progressive movement's agenda for reform at the turn of the 20th century, and were advanced as a means of limiting the control of wealthy special inter-

ests and restoring electoral power to the voters. See, *e. g.*, H. Croly, Progressive Democracy 236–237, 248–249, 254–255 (Transaction ed. 1998); H. Commager, The American Mind 338 (1950); Persily, The Peculiar Geography of Direct Democracy, 2 Mich. L. & Pol'y Rev. 11, 23 (1997). However, in recent years, the initiative and referendum process has come to be more and more influenced by out-of-state interests which employ professional firms doing a nationwide business. See, *e. g.*, Lowenstein & Stern, The First Amendment and Paid Initiative Petition Circulators, 17 Hastings Const. L. Q. 175, 176 (1989); Broder, Ballot Battle, Washington Post, Apr. 12, 1998, pp. A1, A6; Slind-Flor, Election Result: Litigation over Propositions, National Law Journal, Nov. 16, 1998, pp. A1, A8. The state laws that the Court strikes down today would restore some of this initial purpose by limiting the influence that such out-of-state interests may have on the in-state initiative process. The ironic effect of today's opinion is that, in the name of the First Amendment, it strikes down the attempt of a State to allow its own voters (rather than out-of-state persons and political dropouts) to decide what issues should go on the ballot to be decided by the State's registered voters.

The basis of the Court's holding is that because the state laws in question both (1) decrease the pool of potential circulators and (2) reduce the chances that a measure would gather signatures sufficient to qualify for the ballot, the measure is unconstitutional under our decision in *Meyer* v. *Grant*, 486 U. S. 414 (1988). See *ante*, at 194–195. *Meyer*, which also dealt with Colorado's initiative regulations, struck down a criminal ban on *all* paid petition circulators. 486 U. S., at 428. But *Meyer* did not decide that a State cannot impose reasonable regulations on such circulation. Indeed, before today's decision, it appeared that under our case law a State could have imposed reasonable regulations on the circulation of initiative petitions, so that some order could be established over the inherently chaotic nature of

democratic processes. Cf. *Timmons* v. *Twin Cities Area New Party,* 520 U. S. 351, 358 (1997); *Burdick* v. *Takushi,* 504 U. S. 428, 433 (1992); *Storer* v. *Brown,* 415 U. S. 724, 730 (1974). Today's opinion, however, calls into question the validity of *any* regulation of petition circulation which runs afoul of the highly abstract and mechanical test of diminishing the pool of petition circulators or making a proposal less likely to appear on the ballot. See *ante,* at 194–195. It squarely holds that a State may not limit circulators to registered voters, and maintains a sphinx-like silence as to whether it may even limit circulators to state residents.

## II

Section 1–40–112(1) of Colorado's initiative petition law provides that "[n]o section of a petition for any initiative or referendum measure shall be circulated by any person who is not a registered elector and at least eighteen years of age at the time the section is circulated." Colo. Rev. Stat. § 1–40–112(1) (1998). This requirement is obviously intended to ensure that the people involved in getting a measure placed on the ballot are the same people who will ultimately vote on that measure—the electors of the State. Indeed, it is difficult to envision why the State cannot do this, but for the unfortunate dicta in *Meyer.* The parties agree that for purposes of this appeal there are 1.9 million registered voters in Colorado, and that 400,000 persons eligible to vote are not registered. See *ante,* at 193. But registering to vote in Colorado is easy—the only requirements are that a person be 18 years of age or older on the date of the next election, a citizen of the United States, and a resident of the precinct in which the person will vote 30 days immediately prior to the election. See Colo. Rev. Stat. § 1–2–101 (1998). The elector requirement mirrors Colorado's regulation of candidate elections, for which all delegates to county and state assemblies must be registered electors, § 1–4–602(5), and

where candidates cannot be nominated for a primary election unless they are registered electors, § 1–4–601(4)(a).

The Court, however, reasons that the restriction of circulation to electors fails to pass scrutiny under the First Amendment because the decision not to register to vote "implicates political thought and expression." *Ante,* at 195. Surely this can be true of only a very few of the many residents who do not register to vote, but even in the case of the few it should not invalidate the Colorado requirement. Refusing to read current newspapers or to watch television may have "First Amendment implications," but this does not mean that a state university might not refuse to hire such a person to teach a course in "today's media." The examples of unregistered people who wish to circulate initiative petitions presented by the respondents (and relied upon by the Court) are twofold[1]—people who refuse to participate in the political process as a means of protest, and convicted drug felons who have been denied the franchise as part of their punishment. For example, respondent Bill Orr, apparently the mastermind of this litigation, argued before the District Court that "It's my form of . . . private and public protest. I don't believe that representative organs of Government are doing what they're supposed to be doing." 1 Tr. 223. And respondent Jon Baraga, a person affiliated with the "Colorado Hemp Initiative," which seeks to legalize marijuana in Colorado, testified that "there are a great many folks who are refused to participate as registered voters in the political

---

[1] The respondents also presented the example of children who wished to circulate petitions. Indeed, one of the respondents in this case—William David Orr—was a minor when this suit was filed and was apparently included in the action to give it standing to challenge the age restriction element of Colo. Rev. Stat. § 1–40–112(1) (1998). Because the Court of Appeals held that the age restriction on petition circulation was constitutional, it is unnecessary to point out the absurdity of the respondents' minority argument.

process who would like to see our measure gain ballot status and would like to help us do that." *Id.*, at 57.

Thus, the Court today holds that a State cannot require that those who circulate the petitions to get initiatives on the ballot be electors, and that a State is constitutionally required to instead allow those who make no effort to register to vote—political dropouts—and convicted drug dealers to engage in this electoral activity. Although the Court argues that only those eligible to vote may now circulate candidate petitions, there is no Colorado law to this effect. Such a law would also be even harder to administer than one which limited circulation to residents, because eligible Colorado voters are that subset of Colorado residents who have fulfilled the requirements for registration, and have not committed a felony or been otherwise disqualified from the franchise. A State would thus have to perform a background check on circulators to determine if they are not felons. And one of the reasons the State wished to limit petition circulation to electors in the first place was that it is far easier to determine who is an elector from who is a resident, much less who is "voter eligible."[2]

In addition, the Court does not adequately explain what "voter eligible" means. If it means "eligible to vote in the State for which the petitions are circulating" (Colorado, in this case), then it necessarily follows from today's holding that a State may limit petition circulation to its own residents. I would not quarrel with this holding. On the other hand, "voter eligible" could mean "any person eligible to vote in any of the United States or its territories." In this case,

---

[2] The Court dismisses this state interest as "diminished," by noting that the affidavit requirement identifies residents. *Ante,* at 197. Yet even if the interest is diminished, it surely is not eliminated, and it is curious that the Court relies on the affidavit requirement *to strike down the elector requirement,* but does not use it to preserve that part of the disclosure requirements that also contain information duplicated by the affidavits. Cf. Part V, *ante.*

a State would not merely have to run a background check on out-of-state circulators, but would also have to examine whether the unregistered circulator had satisfied whatever are the criteria for voter eligibility in his place of residence, be it Georgia or Guam, Peoria or Puerto Rico.

State ballot initiatives are a matter of state concern, and a State should be able to limit the ability to circulate initiative petitions to those people who can ultimately vote on those initiatives at the polls. If eligible voters make the conscious decision not to register to vote on the grounds that they reject the democratic process, they should have no right to complain that they cannot circulate initiative petitions to people who *are* registered voters. And the idea that convicted drug felons who have lost the right to vote under state law nonetheless have a constitutional right to circulate initiative petitions scarcely passes the "laugh test."

But the implications of today's holding are even more stark than its immediate effect. Under the Court's interpretation of *Meyer*, any ballot initiative regulation is unconstitutional if it either diminishes the pool of people who can circulate petitions or makes it more difficult for a given issue to ultimately appear on the ballot. See *ante*, at 194–195. Thus, while today's judgment is ostensibly circumscribed in scope, it threatens to invalidate a whole host of historically established state regulations of the electoral process in general. Indeed, while the Court is silent with respect to whether a State can limit initiative petition circulation to state residents, the implication of its reading of *Meyer*—that being unable to hire out-of-state circulators would "limi[t] the number of voices who will convey [the initiative proponents'] message," *ante*, at 194–195 (bracketing in original)—is that under today's decision, a State cannot limit the ability to circulate issues of local concern to its own residents.

May a State prohibit children or foreigners from circulating petitions, where such restrictions would also limit the number of voices who could carry the proponents' message

and thus cut down on the size of the audience the initiative proponents could reach? Cf. *Meyer*, 486 U. S., at 422–423. And if initiative petition circulation cannot be limited to electors, it would seem that a State can no longer impose an elector or residency requirement on those who circulate petitions to place candidates on ballots, either. At least 19 States plus the District of Columbia explicitly require that candidate petition circulators be electors,[3] and at least one other State requires that its petition circulators be state residents.[4] Today's decision appears to place each of these laws in serious constitutional jeopardy.

## III

As to the other two laws struck down by the Court, I agree that the badge requirement for petition circulators is unconstitutional. *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334 (1995). I also find instructive, as the Court notes, *ante*, at 197, n. 18, that Colorado does not require such badges for those who circulate candidate petitions. See generally Colo. Rev. Stat. § 1–4–905 (1998).

I disagree, however, that the First Amendment renders the disclosure requirements unconstitutional. The Court affirms the Court of Appeals' invalidation of only the portion of the law that requires final reports to disclose information

---

[3] See Ariz. Rev. Stat. Ann. § 16–315 (1996); Cal. Elec. Code Ann. § 8106(b)(4) (West 1996); Colo. Rev. Stat. § 1–4–905 (1998); Conn. Gen. Stat. § 9–410 (Supp. 1998); D. C. Code Ann. § 1–1312(b)(2) (1992); Idaho Code §§ 34–626, 34–1807 (Supp. 1998); Ill. Comp. Stat., ch. 10, §§ 5/7–10, 5/8–8, 5/10–4 (Supp. 1998); Kan. Stat. Ann. § 25–205(d) (1993); Mich. Comp. Laws § 168.544c(3) (Supp. 1998); Mo. Rev. Stat. § 115.325(2) (1997); Neb. Rev. Stat. § 32–630 (Supp. 1997); N. Y. Elec. Law §§ 6–132, 6–140, 6–204, 6–206 (McKinney 1998); Ohio Rev. Code Ann. § 3503.06 (1996); 25 Pa. Cons. Stat. § 2869 (1994); R. I. Gen. Laws § 17–23–12 (1996); S. D. Comp. Laws Ann. § 12–1–3 (1995); Va. Code Ann. § 24.2–521 (Supp. 1998); W. Va. Code § 3–5–23 (1994); Wis. Stat. § 8.40 (1996); Wyo. Stat. § 22–5–304 (1992).

[4] See Ga. Code Ann. §§ 21–2–132(g)(3)(A), 21–2–170(d)(1) (1993 and Supp. 1997).

specific to each paid circulator—the name, address, and amount paid to each. Important to the Court's decision is the idea that there is no risk of *"quid pro quo"* corruption when money is paid to ballot initiative circulators, and that paid circulators should not have to surrender the anonymity enjoyed by their volunteer counterparts. I disagree with this analysis because, under Colorado law, *all* petition circulators must surrender their anonymity under the affidavit requirement. Colorado law requires that each circulator must submit an affidavit which must include the circulator's "name, the address at which he or she resides, including the street name and number, the city or town, [and] the county." Colo. Rev. Stat. § 1–40–111(2) (1998). This affidavit requirement was upheld by the Tenth Circuit as not significantly burdening political expression, *American Constitutional Law Foundation* v. *Meyer*, 120 F. 3d 1092, 1099 (1997), and is relied upon by the Court in holding that the registered voter requirement is unconstitutional. See *ante*, at 196. The only additional piece of information for which the disclosure requirement asks is thus the amount paid to each circulator. Since even after today's decision the identity of the circulators as well as the total amount of money paid to circulators will be a matter of public record, see *ante*, at 201, I do not believe that this additional requirement is sufficient to invalidate the disclosure requirements as a whole. They serve substantial interests and are sufficiently narrowly tailored to satisfy the First Amendment.

## IV

Because the Court's holding invalidates what I believe to be legitimate restrictions placed by Colorado on the petition circulation process, and because its reasoning calls into question a host of other regulations of both the candidate nomination and petition circulation process, I dissent.